UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-60930-CIV-DIMITROULEAS/Snow

JEANETTE HURTADO,

        Plaintiff,

   vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

      Defendant.
_____/

## **REPORT AND RECOMMENDATION**

      This cause is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability benefits.  The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

### I. PROCEDURAL HISTORY

      The plaintiff filed an application for disability benefits on November 13, 2006, alleging disability since September 21, 2006 as a result of mental impairments and pain in her hip and back.  The application was denied initially and upon reconsideration.  The plaintiff then requested a hearing which was

1

held before Administrative Law Judge (ALJ) Kevin Dugan on November 3, 2008.  The Administrative Law Judge found that the plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the plaintiff's request for review on May 21, 2009.  The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The plaintiff was born on August 11, 1955.  She has a college education and her past relevant work was as an elementary school teacher.  She was insured through March 31, 2008, and alleges that she became disabled on September 21, 2006.

The medical record reveals that the plaintiff was hospitalized in August 2004, pursuant to the Baker Act, after an overdose of lorazepam.  The plaintiff reported depression, poor sleep, high anxiety and a desire to kill herself.  She stated that she had been receiving psychiatric treatment since 1992, and had attempted suicide at the age of 14, 21 and in 1992.  The plaintiff described a history of using marijuana, cocaine and Xanax, and was using alcohol at the time of her hospitalization.  She was discharged from the hospital on September 5, 2004, with a diagnosis of Major Depressive Disorder, Bipolar, Mixed.  The plaintiff was directed to continue outpatient treatment with her psychiatrist,

Dr. Rosa, and was given prescriptions for Zoloft, Seroquel, Effexor, Synthroid and Trazodone.  (R:201-02)

The plaintiff was hospitalized again in April 2005, with suicidal ideation and increasing mood instability.  The plaintiff stated that she was living with her female partner and son, and that she had been sober for two years.  The plaintiff reported conflicts with her partner, difficulty coping with daily stressors, increased irritability and hopelessness.  Her admitting diagnosis was Bipolar Disorder Mixed Severe, with a GAF of 25.  She was discharged on April 15, 2005, with a GAF of 40 and prescriptions for Effexor, Geodon, Prevacid, Claritin, Syntrhoid and Trazodone. (R:214-17)

The plaintiff received outpatient treatment at Compass Health Systems from September 2004 through August 15, 2006. (R:224-43)  A progress note dated April 19, 2005, indicates that the plaintiff's depression and anxiety levels had improved, and on May 17, 2005, she was described as stable.  (R:231-32) On August 4, 2005, the plaintiff reported that she was doing very well on her medication and had gotten a job teaching fifth grade.  She stated that despite external stressors, she was managing well. (R:229)

On September 5, 2005, the plaintiff reported that she was feeling better because her medications were working and helped her get through a relationship breakup.  She stated that she was doing

3

well at her new job. (R:228) On February 7, 2006, the plaintiff reported that she was unable to obtain her medications because she had lost her health insurance, and on April 4, 2006, the plaintiff stated that she was receiving Worker's Compensation benefits. (R:225-26)  On August 15, 2006, the plaintiff stated that she was planning to move to Gainesville and felt that she could not return to teaching. (R:224)

On March 30, 2006, the plaintiff's Worker's Compensation physician stated that the plaintiff had suffered a work-related injury to her right hip and was unable to perform even sedentary work.  The doctor was unable to anticipate the date of maximum medical improvement or whether there would be any residual functional loss. (R:58-59)

On February 27, 2007, a consultative physical examination of the plaintiff was performed by Robert Greenberg, M.D., an internist.  The plaintiff told Dr. Greenberg that she first experienced pain in her right hip in 2001.  She underwent a right hip replacement in 2003, with excellent results.  In March 2006, the plaintiff fell and injured her left hip.  She had a left hip replacement in June 2006, resulting in good pain relief, but with balance and gait problems because her left leg is approximately one inch shorter than her right leg.  She did not need an assistive device for walking. (R:172)

4

The plaintiff stated that she began having low back pain in 2001. The pain had steadily worsened, but did not radiate. The plaintiff reported problems with bending and lifting, but was not taking any medication for these complaints. She related that her primary problem was bipolar disorder. Id.

Physical examination revealed decreased range of motion of the lumbar spine and left hip, and positive straight left leg raising pain at 30 degrees. The plaintiff had no motor, sensory or reflex abnormalities. She walked with a left limp, but could tandem walk and walk on her heels and toes. The plaintiff could not stoop. Grip strength and fine manipulation were normal, and there was no evidence of active inflammatory arthritis. Dr. Greenberg diagnosed osteoarthritis of the hips and lumbar spine. (R:173)

On the same date, a Mental Residual Functional Capacity Assessment form was completed by Michael Zelenka, Ph.D., a state agency non-examining psychologist. Dr. Zelenka found that the plaintiff had no significant limitations in her abilities to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special

supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation. The plaintiff was moderately limited in her abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public. The plaintiff had no marked limitations. (R:174-75)

Dr. Zelenka noted that the plaintiff may have some problems with attention and concentration, particularly when anxious. However, she was able to live with her 17-year-old son and drive him to school, shop, prepare meals and do chores. Dr. Zelenka opined that the plaintiff might not be able to cope with the demands of the classroom, but given only simple instructions to

carry out, limited public contact and some allowances for occasional problems with attention and concentration and for occasional problems affecting productivity, the plaintiff retained adequate mental ability to carry out simple instructions and to relate adequately to others in a routine work setting. (R:176).

Also on February 27, 2007, Dr. Zelenka completed a Psychiatric Review Technique Form. He opined that the plaintiff suffered from Bipolar Syndrome and Anxiety Disorder, NOS. He found that the plaintiff had mild restriction in the activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace, and one or two episodes of decompensation, each of extended duration. (R:178-90)

On March 16, 2007, a Physical Residual Capacity Assessment of the plaintiff was performed by Shea Vicek, a State agency non-examining medical consultant. The assessment indicated that the plaintiff could lift 10 pounds frequently and 20 pounds occasionally; could stand/walk or sit for 6 hours in an 8-hour workday, had an unlimited ability to push and pull. In commentary the consultant pointed out that there was insufficient evidence of disability during the time between the plaintiff's alleged onset date (September 21, 2006) and the date she was last insured (September 30, 2008). (R:161)

The assessment went on to indicate that the plaintiff could climb frequently, but only occasionally could balance, stoop, kneel, crouch or crawl.  The plaintiff had no manipulative, visual or communicative limitations, but had to avoid concentrated exposure to wetness, humidity, fumes and hazards such as machinery and heights.  Specific references were made to the report of Dr. Greenberg, and it was noted that there was no treating physician's report in the file. (R:161-64)

On April 12, 2007, the plaintiff presented to the University of Florida Shands Eastside Community Practice complaining of severe hip, leg and back pain.  The plaintiff stated that she suffered pain as the result of a leg length discrepancy, and that the pain had worsened to the point of becoming unbearable. She stated that she had obtained Percocet and Flexeril from the emergency room, but her prescriptions had run out.  Clinic notes indicated that the plaintiff walked with a visible limp, and that her prescriptions were refilled. (R:338,344) The plaintiff also received treatment at Shands for hypothyroidism and syncope. (R:332-57)  On July 6, 2007, the "social history" portion of her endocrinologist's report indicates that the plaintiff was still unable to work. (R:356)

On August 31, 2007, the plaintiff again was hospitalized for depression and suicidal ideation, which the plaintiff said had

8

been triggered by her discovery that her son was a cross-dresser. At that time, the plaintiff was living with her partner of 11 years. (R:286)  On September 3, 2007, the attending physician noted that the plaintiff was back on her medication and was no longer feeling depressed.  She was sleeping well, with no suicidal ideation and no manic or psychotic symptoms.  The plaintiff understood that she needed to continue with her medications on discharge. (R:304)  She was discharged on September 5, 2007, with a diagnosis of Bipolar Disorder and a GAF of 45, and was given prescriptions for various medications, including Effexor and Trazodone.  (R:287)

On February 5, 2008, William E. Beaty, Ph.D., performed a consultative psychological evaluation of the plaintiff.  The plaintiff told Dr. Beaty that she had been married four times, and last was divorced in 1997.  At the time of the evaluation, the plaintiff was living with a roommate and an 18-year-old son.  She had a 33-year-old daughter who was living in Puerto Rico.  The plaintiff had a bachelor's degree in elementary education and a master's degree in educational psychology.  She also had 18 credits in the teaching of English as a second language.  (R:157)

The plaintiff related that she had worked for 17 years as an elementary school teacher.  She also worked part time teaching English.  The plaintiff stated that from 2000-2005 she stopped

9

working because of depression.  She tried teaching again in 2005-
06, but felt that her work was of poorer quality and she was having
trouble concentrating.  In 2006 she fell at work, resulting in an
injury that required a hip replacement.  This was covered under
Worker's Compensation.  The plaintiff has not worked since that
time. Id.

The plaintiff told Dr. Beaty that she suffered from
hypothyroidism, for which she has taken Synthroid since 1983.  She
has had two hip replacements in 2003 and 2006.  The plaintiff
stated that she was the victim of sexual abuse by an uncle from the
ages of 4-12.  She also was the victim of mental abuse by her last
husband, who was an alcoholic, from 1990-97.  (R:158)

The plaintiff related that her depression began in 1990,
as the result of her husband's abusive treatment.  She stated that
she had been hospitalized for 14 days in 1996 in Puerto Rico for
severe   depression.    The   plaintiff   also   described   her
hospitalizations in 2004, 2005 and 2007.  She complained of
depression, anxiety, obsessive-compulsive behavior, insomnia and
memory problems.  Her psychotropic medications were Effexor,
Klonopin, Abilify and Trazedone.  The plaintiff stated that she was
addicted to cocaine from 1996-2000, when she quit using the drug,
but denied ever using alcohol. Id.

10

The plaintiff's daily activities included walking the dog, doing light housework, fixing light meals and watching television. She stated that she cannot bend more than 90 degrees because of pain in her hip. It was difficult to use a mop or clean toilets because of hip pain, but she could use a small, light vacuum. The plaintiff reported having no friends or social life. Id.

Dr. Beaty's mental status assessment of the plaintiff revealed depressed and anxious mood; constricted and flat affect; oriented as to person, place, date time, reason for coming to the evaluation, current and previous presidents; normal speech; no delusional or paranoid thought content, with appropriate answers to questions; average to high average cognitive ability with poor insight; no memory impairment other than that reported by the plaintiff; no hallucinations or perceptual disturbances; no current suicidal/homicidal ideation, and no extraneous motions. The plaintiff was pleasant, cooperative and responsive to questions. She had good eye contact and displayed appropriate social skills. (R:158-59).

Dr. Beaty diagnosed Bipolar II Disorder/Depressed; Major Depressive Disorder, single, severe without psychotic features; Obsessive-Compulsive Disorder; Post-traumatic Stress Disorder, chronic, and Cocaine Dependence, in remission. He assigned a GAF

of 55, with a poor to guarded prognosis.  Regarding the plaintiff's ability to do work-related tasks, Dr. Beaty stated that sitting was not a problem; standing for a very long time caused one leg to give way; walking was possible for short distances only; lifting confined to light weights; no problem handling objects if they are not very heavy; no problems with hearing or speaking; poor sense of direction, and anxiety when driving.  The plaintiff reported poor memory, concentration and task persistence, and socialization limited to her roommate and son. (R:159)

        The plaintiff was hospitalized at Meridian Behavioral Healthcare for depression on February 6, 2008, the day after her evaluation by Dr. Beaty.  She stated that she had been off her medications for three weeks.  Medication was resumed and on February 9, 2008, the plaintiff was discharged in stable condition. (R:307)

        On February 14, 2008, a second Psychiatric Review Technique Form pertaining to the plaintiff was completed by Alan J. Harris, Ph.D., a non-examining State agency psychologist.  Dr. Harris opined that the plaintiff suffered from Bipolar Syndrome and an anxiety-related disorder with panic.  Dr. Harris found that the plaintiff had no restrictions in the activities of daily living, no difficulties in maintaining social functioning, no difficulties in

12

maintaining concentration, persistence or pace and no episodes of decomposition.  (R:315-28)

On February 15, 2008, the plaintiff was admitted to Imperial Point Medical Center, again for treatment of depression and suicidal thoughts.  By February 22, 2008, the plaintiff was stable and without complaints, and she was discharged with prescriptions for Mirtazapine, Effexor, Abilify, Klonopin and seroquel.  (R:260)

On April 15, 2008, the plaintiff reported that she was 100% compliant with her medications, with no side effects.  She complained of minor depression and anxiety as the result of relationship issues with her partner.  She had no mania or severe mood swings and no difficulty sleeping.  Her GAF was assessed at 50. (R:294)

On August 4, 2008, the plaintiff presented to Henderson Mental Health Center to obtain refills of her medication.  She stated that she felt stable and was sleeping well.  The therapist assigned a GAF of 40.  (R:148)  On August 21, 2008, the plaintiff reported that she recently had moved from Gainesville because of a relationship breakup.  She stated that her medications were working pretty well, she was sleeping 6-8 hours per night and her appetite was normal.  She had some depression owing to her circumstances and her last episode of mania was six months earlier.  (R:150)  On

13

September 22, 2008, the plaintiff related that she was experiencing some depression and obsessive thoughts, but was better. (R:146)

At the evidentiary hearing, the plaintiff testified that she was living with her parents and son, since she had been evicted from her apartment for non-payment of rent. She helped care for her mother, who was in poor health. The plaintiff was able to cook, with supervision, and be there for her mother if she needed something. However, the plaintiff was unable to administer medication to her mother because of her memory problems, and was unable to bathe her because she could not bend more than 90 degrees. The plaintiff's father did most of the housecleaning, but the plaintiff was able to light chores such as dusting and passing the vacuum cleaner. The plaintiff no longer drove a car. (R:361-65)

The plaintiff related that she had been a teacher for 17 years. She stated that she did not work during the years 2001-2004 because she was sick from depression. She explained that she had not applied for disability during that time period because she was being supported by her significant other. The plaintiff went back to work in 2005 when she broke up with her significant other. She stated that she had difficulty teaching math and could not control her group. Following her accident, the plaintiff did not try to go

back to work because she felt that she was not teaching to the best of her ability and was not being fair to the children. (R:366-68)

The plaintiff testified that she has to wear special shoes as the result of the imbalance in the length of her legs, but that she was not wearing the shoes because she could not afford them.  She stated that she could walk for a couple of blocks without taking a break and could stand for half an hour at the most.  She could sit for no more than one hour.  She had to elevate her legs because they swell up.  The plaintiff could not bend down to lift something that is heavy, but was able to lift five to ten pounds.  She was afraid of taking public transportation because she got lost.  She no longer went out anywhere by herself.  (R:369-71)

The plaintiff related that she takes her evening medications but sometimes did not take Seroquel in the morning because it made her sleepy.  She believed that her bipolar disorder was basically stable with medication, but her anxiety and obsessive-compulsive disorder had not improved significantly.  Her daily activities consisted of taking a bath, making simple meals and watching TV.  The plaintiff stated that she could not shave her own legs and was unable to read because she lost concentration. (R:371-73)

The plaintiff testified that she became very anxious and obsessed over any changes in her routine.  She also had developed

a phobia about being around other people.  If she had to meet someone, she would shake, cry and get confused.  (R:373-74)

Dr. Howard Feldman, a vocational expert (VE), testified that the plaintiff's past relevant work as a school teacher was classified as skilled light work.  Many of the skills associated with this job were transferrable, such as oral and written communication, record-keeping, understanding and use of technical data and inspection.  The ALJ asked Dr. Feldman to consider whether an individual with the plaintiff's work background, age and education, who was limited to light work, who could only occasionally climb, balance, stoop, crawl, crouch and kneel, who needed to avoid concentrated exposure to heights and hazards, as well as wetness, humidity, odors and poor ventilation, and who could perform only simple routine tasks with limited public contact, could perform the plaintiff's past relevant work. (R:377)

Dr. Feldman testified that the plaintiff's prior work was complex in nature and beyond the parameters of the hypothetical.  However, there were some occupations that would not be prohibited, such as fast food work (DOT Code Number 311.472-010, classified as light unskilled work with an SVP of 2) and mail clerk (DOT Code Number 209.687-026, listed as light unskilled work with an SVP of 2).  Both jobs existed in significant numbers in the national and local economies.  The VE also testified that his description of the

jobs was consistent with the way they are described in the Dictionary of Occupational Titles. (R:377-78)

<u>III. DECISION OF THE ALJ</u>

The ALJ first found that the plaintiff last met the insured status requirements of the Social Security Act (SSA) on March 31, 2008, and that she had not engaged in any substantial gainful activity during the period from her alleged onset date of September 21, 2006, through the date she was last insured. Next, the ALJ determined that through the date she was last insured the plaintiff had severe impairments consisting of bipolar disorder, major depressive disorder, obsessive compulsive disorder and osteoarthritis of the hips and lumbar spine. However, during the relevant time period the plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R:14)

The ALJ explained that none of the plaintiff's mental impairments, considered singly or in combination, met or medically equaled the criteria of Listing 12.04, because the plaintiff did not have "marked" limitations in two of the four categories: activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace, or repeated episodes of decompensation, each of extended duration. The ALJ

17

noted that the plaintiff had only mild restrictions in the activities of daily living, evidenced by her reported abilities to walk the dog, take medication, cook meals, watch television and do light housework. She had moderate difficulties in social functioning, but the consultative examining psychologist, Dr. Beaty, had observed that the plaintiff was pleasant, cooperative and responsive to questions. She also maintained eye contact and displayed appropriate social skills. The plaintiff had moderate difficulty in concentration, persistence or pace, based on her complaints of poor concentration, but had only one or two episodes of decompensation which were of extended duration. (R:15)

The ALJ concluded that the plaintiff retained the residual functional capacity to perform light work, except that she could only occasionally climb, balance, stoop, kneel, crouch and crawl; needed to avoid concentrated exposure to wetness, humidity, fumes, odors, dusts, gases and hazards such as moving machinery and unprotected heights, and could perform only simple routine tasks with limited contact with the public. The ALJ noted that at the time the plaintiff filed her application for benefits, she alleged an inability to focus and concentrate, memory loss, panic attacks, anxiety and the inability to lift and carry things. The ALJ found that although the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the

18

plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's residual functional capacity assessment.  (R:15-16)

The ALJ acknowledged that the plaintiff had been hospitalized several times for depression, but noted that some admissions had been triggered by the loss of a relationship and some resulted from non-compliance with medication.  Regarding alleged memory deficits, the ALJ pointed out that on February 5, 2008, Dr. Beaty had noted no memory impairment. The ALJ observed that the State agency psychological consultant found that the plaintiff retained the ability to carry out simple instructions and relate adequately to others in a routine work setting.  The State agency medical consultant found that the plaintiff could lift up to 10 pounds frequently and 20 pounds occasionally, could stand and walk or sit for 6 hours during an 8 hour workday, could balance, stoop, kneel, crouch and crawl occasionally, and should avoid concentrated exposure to wetness, humidity, fumes, odors, dusts, gases and hazards such as moving machinery and unprotected heights. The ALJ gave great weight to the opinion of the medical consultant because he cited the specific facts upon which his conclusions were based.  Specifically, the consultant noted that the plaintiff had decreased range of motion of the lumbosacral spine and left hip,

but no motor, sensory or reflex abnormalities.  The consultant also noted that although the plaintiff walked with a limp, she did not require an assistive device. (R:16-17)

The ALJ considered the plaintiff's testimony that she could walk only a couple of blocks before getting tired, stand for 30 minutes, sit for one hour and carry only five to ten pounds. The ALJ found that these allegations were not credible, pointing out that the plaintiff performs various household chores and helps care for her mother.  The ALJ also considered the treatment records from Henderson Mental Health Center during August and September 2008, close to the expiration of the plaintiff's insured status. These records indicated that the plaintiff felt her medications were working well at that time and her mental status examinations were essentially normal. (R:17)

Based on the plaintiff's restriction to performing simple routine tasks, the ALJ found that the plaintiff was unable to perform her past relevant work.  Using the Medical-Vocational Guidelines as a framework for his decision, the ALJ found that on the date she was last insured, the plaintiff was an individual closely approaching advanced age, had at least a high school education and was able to communicate in English.  Transferability of job skills was not material to the determination, and based on the testimony of the VE, there were jobs that existed in

significant numbers in the national economy that the plaintiff
could perform.  Specifically, the plaintiff could perform the jobs
of fast food worker and mail clerk.  The ALJ found, without
elaboration, that the VE's testimony was consistent with the
information contained in the DOT.  Accordingly, the ALJ concluded
that as of the date she was last insured, the plaintiff was not
disabled within the meaning of the SSA. (R:18-19)

### IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The plaintiff seeks reversal or remand on two grounds:
(1) the ALJ did not discuss or give any weight to the opinions of
her treating physicians (her endocrinologist and the worker's
compensation physician) and (2) the ALJ erroneously relied on the
VE's testimony that the jobs he described were consistent with the
information contained in the DOT.

The Commissioner contends that the decision of the ALJ
should be affirmed because it was based on substantial evidence and
the correct legal standards were applied.

### V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision
of the Commissioner, as reflected by the record, is supported by
substantial evidence.  "Even if the evidence preponderates against
the Secretary, we must affirm if the decision is supported by
substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th

Cir. 1985).  Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983).  The Court must review the record as a whole to determine if the decision is supported by substantial evidence.  Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards.  No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  Richardson, supra.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant

work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform.  Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

A. <u>Opinions of Treating Physicians</u>

The plaintiff's first argument is that the ALJ erred by not considering and giving great weight to the opinions of her treating physicians: the Worker's Compensation doctor, who found that the plaintiff was unable to perform any work as of March 30, 2006, and her endocrinologist, who noted in the "social history" portion of his July 6, 2007, report that the plaintiff was still unable to work.

The testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997); <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 CFR §§ 404.157(d)(2), 416.927(d)(2)(1999). This Circuit has held that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the physician's

23

opinion was conclusory or inconsistent with their own medical records.  <u>Lewis</u>, 125 F.3d at 440; <u>Jones v. Department of Health & Human Services</u>, 941 F.2d 1529, 1532-3 (11th Cir. 1991); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991).

However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'" <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005), quoting <u>Foote v. Chater</u>, 67 F.3d 1553, 1561 (11th Cir. 1995)(internal quotation omitted).  Rather, the ALJ is required to consider "all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand." <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).  Moreover, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998).

In the instant case, the two opinions about which the plaintiff complains were not relevant to the question before this court: whether the plaintiff was under a disability, based on the impairments she alleged, from the time of her alleged onset date through the date she was last insured.  The July 2007 report of the

plaintiff's endocrinologist dealt with the plaintiff's treatment for hypothyroidism, which is not an impairment which the plaintiff alleges contributed to her disability. Moreover, the portion of this report indicating that the plaintiff was still unable to work was labeled "social history" and most likely was based on information supplied by the plaintiff. There is nothing in the record to indicate that this doctor was treating the plaintiff for any disabling condition and there was no reason for him to an express an opinion on this issue.

The second "treating physician" report was a form filled out by a Worker's Compensation doctor, who stated that the plaintiff was unable to work on March 30, 2006, a short time after she injured her hip. The report is not accompanied by any treatment notes or test results. Moreover, subsequent to March 2006, the plaintiff had hip replacement surgery, which substantially reduced her pain. This report also has no relevance to the issue at hand, and it was not error for the ALJ to omit any reference to it.

The plaintiff is not entitled to relief based on the AlJ's failure to give any weight to the opinions of these two physicians.

B. <u>Conflict Between VE Testimony and DOT Definitions</u>

The plaintiff's second ground for relief is based on what she contends is a conflict between the VE's description of the jobs of fast food worker and the DOT.  The plaintiff bases her argument on the fact that the VE was asked to consider only jobs which involved "simple routine tasks."  The plaintiff points out that the DOT describes the job of fast food worker as Reasoning Level 2, and the job of Mail Clerk as Reasoning Level 3.  (Plaintiff's Motion for Summary Judgment, DE 13, Ex. B) The plaintiff further notes that Reasoning Level 2 contemplates the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and Reasoning Level 3 involves the ability to "apply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form." (DE 13, Ex. C)

The plaintiff contends that these descriptions conflict with the AlJ's hypothetical, which presumed an ability to perform only simple routine tasks.  She argues that under SSR 00-4p, the ALJ was required to address this issue with the VE at the hearing, or state his reasons for relying on the VE despite the conflict between the VE's testimony and the DOT. (DE 13, Ex. A)

The Commissioner points out that "in this Circuit, the ALJ is not required to go on a searching inquiry into the contents

of the DOT to verify consistency with the testimony of the VE." Akins v. Commissioner, 2009 WL 2913538 (M.D. Fla. 2009), citing Miller v. Commissioner, 246 Fed. Appx. 660, 664 (11th Cir. 2007)("Even assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict, he relied on the testimony of the vocational expert."); Jones v. Apfel, 190 F.3d 1224, 1229-30 (11th Cir. 1999)("when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT."). Therefore, the ALJ was entitled to rely on the VE's testimony that his job descriptions were consistent with the information contained in the DOT.

The Commissioner also notes that the ALJ's limitation of the plaintiff's residual functional capacity to simple routine tasks did not imply that the plaintiff lacked the ability to reason. She has a college education and it is her memory, rather than her cognitive ability, that appears to be limited. Most courts which have addressed this issue have held that the requirement of Reasoning Level 2 or 3 is not inconsistent with the ability to perform only simple tasks, and thus no conflict existed between the VE's job descriptions and the DOT. Miller, 246 Fed.Appx. at 662 (no remand where VE identified Reasoning Level 3 jobs for plaintiff who could do only simple, routine and repetitive

27

work);  Renfrew  v.  Astrue,  496  F.3d  918,  921  (8th  Cir.
2007)(Reasoning Level 3 not inconsistent with plaintiff's inability
to do complex work);  Terry v. Astrue, 580 F.3rd 471, 478 (7th Cir.
2009)(Level 3 reasoning not inconsistent with plaintiff's ability
to perform only simple work);  Lara v. Astrue, 305 Fed.Appx. 324,
326 (9th Cir. 2008)(plaintiff able to perform simple, repetitive
tasks capable of doing work at Reasoning Level 2).

       The Commissioner concedes that at least one case has held
that Reasoning Level 2 jobs are more consistent with simple routine
tasks than Reasoning Level 3 jobs.  Hackett v. Barnhart, 395 F.3d
1168, 1176 (10th Cir. 2005).  However, the Commissioner points out
that only the mail clerk job involved Level 3 reasoning.   The
Commissioner argues that even if it was error to cite the mail
clerk position as one the plaintiff could perform, the error was
harmless because the plaintiff was able to perform the Level 2
Reasoning job of fast food worker.  As the court stated in Lara,
305 Fed. Appx. at 324:

                While the job categories the VE suggested Lara
                remains able to perform arguably included some
                jobs he is unable to perform, the categories
                also included Reasoning Level 1 and 2 jobs
                that he can perform. To the extent the VE was
                overly broad and included jobs that Lara could
                both perform and not perform, any error is
                harmless so long as the jobs that could be
                done are enough to support the ALJ's decision.
                The Reasoning Level 1 and 2 jobs constitute
                substantial  evidence  of  significant  jobs

28

available in the economy, meeting the step-five threshold.

The undersigned concludes that the ALJ was not required to elicit from the VE an explanation of the purported conflict between the VE's job descriptions and the information contained in the DOT.  <u>Miller</u>, 246 Fed. Appx. at 662.  The undersigned also concludes that there was no conflict between the VE's job descriptions and the DOT, in that substantial evidence in the record supports the finding that the plaintiff's limitation to simple routine tasks was not inconsistent with the DOT description of the jobs of mail clerk and fast food worker. <u>Renfrew v. Astrue</u>, 496 F.3d at 921; <u>Terry v. Astrue</u>, 580 F.3rd at 478.  Finally, even if the plaintiff was unable to perform the job requirements of Reasoning Level 3, she clearly was able to perform the Reasoning Level 2 job of fast food worker, and any error by the ALJ was harmless.  <u>Lara</u>, 305 Fed. Appx. at 324.  Therefore, the decision of the ALJ should not be disturbed.

<u>VI. CONCLUSION</u>

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the plaintiff's Motion for Summary Judgment (Docket Entry 12) be DENIED, and the Commissioner's Motion for Summary Judgment (Docket Entry 15) be GRANTED.

29

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 14th day of April, 2010.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

Adam Scott Neidenberg, Esq. (P)
AUSA Steven R. Petri (D

30